It's number 2410934. And we'll hear first from Ms. Utrecht. Good afternoon, Your Honor. I'm Ms. Utrecht on behalf of the government. I have reserved five minutes for rebuttal. Your Honor, there are three issues I'd like to touch on today. The first two are critically important. As they relate to the jurisdiction of the District Court over this case.  First, there is no jurisdiction because there has not been a final determination of payment which is required under the Medicare Act to bring a challenge to a Medicare regulation that governs the calculation and eligibility for payments. Second, I would like to address the plaintiff's alternative theory of jurisdiction, which was not endorsed by the District Court, that this case does not arise under the Medicare Act. Because this is a challenge to a Medicare regulation that governs Medicare payments and because the substance of plaintiff's complaint is that the regulation is contrary to law because it violates the Medicare Act, this is clearly a case that arises under Medicare. And the third argument, the third issue I'd like to address today, of course, because there is no jurisdiction, it is unnecessary for this Court to address the merits, but if there is time, I would like to briefly explain why the District Court erred in holding that Forest General controls the merits of this case. So beginning with the jurisdictional questions, Your Honor, the Medicare Act generally prohibits anticipatory challenges to Medicare payment regulations. These kinds of challenges must be raised in the context of a specific payment dispute after, in the words of a statute, a final determination by the Secretary as to the amount of payment has issued. Plaintiffs here have brought an anticipatory challenge to a Medicare regulation before there has been any kind of final determination as to the specific hospital payments that they will receive. Well, their argument is pretty simple. It is the determination is zero. So that is what they've said, but that's also a fundamental misunderstanding about how disproportionate share hospital payments are calculated. It's not incorrect, is it? It is, it is, in fact, incorrect, Your Honor. And I would urge this Court to refer to the D.C. Circuit's recent decision in Battle Creek, which explains a lot about how the disproportionate share hospital payment is made. But by way of brief way of background, of course, there is a very complicated formula for determining the, I will use the shorthand, dish payment. A hospital's overall percentage has to exceed a certain threshold, and once they hit that, they can be eligible for a dish payment, and the amount of dish payment changes over time depending on what their actual percentage is. And, of course, this percentage is calculated by looking at two fractions. The first, which is not at issue in this case, is not affected by the regulations, is the percentage of patients that a hospital treated in a given year during a cost-reporting period who were eligible for supplemental security income. And the second is the percentage of people who were eligible for Medicaid out of the total patients that the hospitals treated in a given cost-reporting year. You look at those two fractions, and the sum of them gives you your dish percentage. If your dish percentage is above a certain amount, you can be entitled to a dish payment, and that adjusts. And so why this isn't a zero-dollar payment, as plaintiffs have described, is because the percentage of people who are Medicaid-eligible, which is the only thing this regulation governs, it governs how you determine whether someone's regarded as Medicaid-eligible for purposes of the second fraction, that is only one variable that's used to calculate the percentage, and it's only after you've reached a threshold that you can get a payment. And so in practical terms, what that means is you could, in theory, because of the other variables, include all of the hypothetical patients that these hospitals want to include, and depending on the other circumstances, the other data that isn't currently in the record because there hasn't been a cost report, the hospitals could get the exact same payment. They might not be eligible for dish payments at all. The actual number depends on all of this information that has not yet been submitted. The other thing I would emphasize, Your Honor, as the D.C. Circuit explained in its Battle Creek decision, dish payments are payments that are made by statute and by regulation. They're payments that are determined at the end of the cost-reporting period during the settlement. The statute requires, among other things, that hospitals, before they can bring a challenge to the PRRB, that the hospitals submit the reports the secretary may require to calculate the payment. And by regulation, the secretary requires cost reports that detail how many patients you treated, what the characteristics of those patients were, whether they were eligible for Medicaid, whether they received benefits under a demonstration project. All of that data, at the end of the year, is submitted, and that is what is used to calculate the final determination. These hospitals have not submitted that data, and they could not, because the regulation has not been in effect for any of the fiscal years to which they've submitted cost reports. So, for that reason, the district court fundamentally erred in determining that there had been a final determination here. There isn't a single case that plaintiffs have cited that supports the idea that this kind of regulation, standing on its own, is a final determination. The closest that they have come to citing a case is the D.C. Circuit's decision in Washington Hospital, which, of course, Battle Creek, the D.C. Circuit interpreting its own precedent, explained why Washington Hospital does not actually support this proposition, that, in fact, because dish payments are retrospectively calculated at the end of the year, there cannot be a final determination until the end of the year, until these cost reports are submitted. As to plaintiff's alternative argument . . . So, let me just ask you a question, though. So, you're . . . well, number one, has the new administration changed its position on this case? It has. Are you . . . I mean, you can stand here and verify that to me. I can stand here and verify the new administration, which has . . . I believe this reply brief was filed after the change in administration. I understand that, but there are a bunch of cases where they, you know, we've gotten right up to the cusp of decision, and then they say, no, wait, please. And the second question I have is, do you . . . does Medicare not regard itself as bound by Forest General for dish payments in this circuit? So, to respond . . . to answer both of those questions, Your Honor. So, first, especially on the jurisdictional issue, that is not an issue that there would be any reason for there to be a change in position. We, of course, have had the same position as to what Medicare Act requires and what . . . across administrations. As on the merits, if that is the question of whether this regulation is something that the current administration supports, of course, we've been . . . Well, I didn't . . . . . . dealing with this issue . . . That was not what I was . . . . . . that I wanted to make sure I understood the question. I know that several administrations have been trying to undo these uncompensated care aspects of dish. And Forest General, of course, said you have to . . . that they're to be treated on the same as other Medicaid-eligible patients. So, I'm asking, does the administration plan to engage in non-acquiescence? So, Your Honor, two responses. First, of course, plaintiff's challenge on the merits is not before the court if there is no jurisdiction. And we're not saying that there isn't a . . . Let . . . just answer the question I asked you, because you were already talking about jurisdiction. And I just . . . I just interjected this. I'm sorry it's not in the right order of your presentation. I'm sorry, Your Honor. I just wanted to clarify and make sure we were all on the same page. I'm happy to address the merits. As to the merits, Forest General did not address the extent of the Secretary's authority to regard or not regard a patient that benefits from a demonstration project as Medicaid-eligible. Of course, Forest General has to be understood in terms of the actual facts that were before the case and the issue that was before the court. What was at issue in Forest General was a demonstration project that authorized an uncompensated care pool. And the court . . . Well, excuse me. Okay. Well, we'll get back to jurisdiction now, because I understood your brief to be saying that Forest General should be reversed en banc. So I just was trying to explore that part of it. Oh. So I just want to be very clear, Your Honor. This court does not need to overrule Forest General in order to reverse the district court on the merits here. And that is because the central question here is the extent of the Secretary's authority to decide whether or not to regard patients that benefit from a demonstration project as Medicaid-eligible. That was not a question before this court in Forest General. And if I can take a step back and just explain. The Forest General concerned . . . The holding of Forest General was, in our view, as follows. The Medicare Act says that if you have regarded a patient who receives benefits from a demonstration project as Medicaid-eligible, that patient must be included in the Medicaid fraction. And then Forest General went on to analyze the Secretary's then-existing regulations and determined that the Secretary had, in fact, regarded the patients as Medicaid-eligible. And the reason for that was because the then-existing regulations said that if a patient receives inpatient hospital services by virtue of a demonstration project, they are regarded as Medicaid-eligible. And Forest General looked at the administrative record in that case and held that the Mississippi Demonstration Project patients who had their full hospital costs paid for by the Mississippi Demonstration Uncompensated Care Pool had received that benefit. And so the court said, well, the Secretary has regarded these patients as Medicaid-eligible because they received those inpatient hospital services. Now that you have done that, you must include them and you can't change your mind retrospectively. However, we are now faced with a situation, which Forest General did not opine on, where the Secretary has amended the regulations, has changed who is regarded as Medicaid-eligible, who has said, in fact, it's not just anyone who receives inpatient hospital services. We are only regarding those patients who receive the benefit of health insurance coverage, who the state's demonstration project has said we are ensuring that these patients will have their care paid for, not, in the case of an uncompensated care pool, a plan in which the state has said we would like to ensure that there is supplemental funding available to hospitals to make sure that they can stay financially solvent despite having a lot of uncompensated care costs. That discretionary determination, that determination as to who should be regarded, what type of benefit should be received by a patient in order to be regarded as Medicaid-eligible, is something that we know Congress intended for HHS to have because the Deficit Reduction Act, which added this language to the statute, Section 5002B3 specifically ratified and prospectively endorsed the Secretary's prior policies, including policies that said that no patient who received benefits who was discharged prior to 2000 could be regarded as eligible and would be included in the statute. And so we know that Congress thought that the Secretary could decide what type of benefit a patient had to receive in order to be regarded as Medicaid-eligible, and that is what the Secretary did here. The Forest General did not, has no holding as to that question, as to the extent of the Secretary's discretion to promulgate regulations like this, and for that reason, regardless of what we view as flaws in Forest General's reasoning on unrelated questions, such as the meaning of may and to the extent for the period of that part, that separate textual language in the statute, regardless of our disagreements with that, this Court does not need to overrule or disagree with Forest General in order to hold that the regulation here is proper because Forest General did not opine on the question of the Secretary's authority to promulgate regulations like this one. And lastly, the only other issue I think we haven't touched on is the plaintiff's alternative argument that this is not a case that arises under Medicare because this is, in their view, a case there's Federal question jurisdiction on because of their concerns about potential downstream collateral effects on the 340B program, their eligibility for drug discounts under that program. As to that, Your Honor, I would note that, among other things, the standing and substance of plaintiff's complaint critically depends on the Medicare Act. There, as I mentioned earlier, they are challenging a Medicare regulation that governs how to calculate eligibility for patients. Their argument on the merits is that the Medicare Act prohibits this regulation. That, I think, under the Supreme Court's precedent or this Court's precedent, shows that this is clearly a case that arises under Medicare, so there is no Federal question jurisdiction. The only other thing that I would note is also that the complaint itself is not challenging any 340B determination. We would obviously be in a very different position if plaintiff's complaint were something about, you know, a complaint about how eligibility determinations under 340B are made, something that was unique to that program. But what they are trying to do here is invalidate a Medicare regulation, and that is clearly a case that arises under Medicare. If there are any questions on that, I would be happy to address them. Otherwise, I would like to reserve the remainder of my time. Thank you. All right, you have time for rebuttal. Mr. Jindal. Good afternoon, Your Honor. May it please the Court, and a question on behalf of Hospital Appellees. This appeal concerns a final rule issued by the Secretary seeking to exclude Medicaid demonstration project days from the calculation of the dish percentage. Notably, this has two separate impacts on hospitals. It lowers their Medicare dish payments, Your Honor, and it threatens their ability to access important 340B program discounts. The District Court below vacated this rule in a decision that it deemed, quote, simple on the merits, end quote. And indeed, this was entirely correct, because this Court's opinion in force general already squarely addressed the very same issues on the merits addressed by this case, Your Honor, namely whether inpatient hospital days reimbursed under Medicaid and regarded as such by virtue of a Secretary-approved demonstration project count as Medicaid days for purposes of the dish calculation. Notwithstanding what the Secretary argues, that force general didn't interpret or apply the statute, but instead merely applied the regulation at hand, the force general was clear in noting that the statute, quote, unambiguously requires the agency to include such patient days, end quote, Your Honor. And indeed, the entire opinion of force general comprehensively and decisively interprets the statute in that manner. Indeed, again quoting from force general, because it's so clear on this, it noted, quote, certain days just go into the fractions numerator. If patients underlying a given day were Medicaid eligible or received benefits under a demonstration project, as was the case here, Your Honor, then that day goes into the numerator, period, end quote. Clearly, force general clearly applies to preclude the Secretary's rule that it issued here, excluding uncompensated care days from being included within the Medicaid dish percentage calculation, Your Honor, and the district court was entirely correct in vacating the rule on its merits. Notably, force general rule means entirely valid in binding law within the circuit, within this court, and therefore binding on this panel. Indeed, it was issued unanimously without any dissent. It was subject to a rehearing en banc where the Secretary advanced the very same arguments it tries to make here and that were rejected by the full court and not granting a rehearing en banc. And notably, the opinion itself has been cited approvingly and endorsed by other courts, including the district court in D.C. and the D.C. circuit and Bethesda Health, Your Honor. There's simply no basis to overturn or depart from the court's well-reasoned opinion and its interpretation of the statutory language and framework to preclude the very type of rule and regulation issued by the Secretary here. Your Honors, with the merits of this, the rule squarely foreclosed by force general, as you can see from the Secretary's argument, they also tried to separately argue that there's no jurisdiction for the court to hear this case now, and that, too, is incorrect, Your Honor. And again, the rule itself threatens two separate distinct benefits, each of which provide jurisdiction to this court. And I'll start with the basis of jurisdiction under 28 U.S.C. 1331, federal question jurisdiction, which relates to the benefits that are threatened directly for hospitals as a result of the rule relating to their 340B-related injuries. Notably, Your Honor, these injuries do not arise under Medicare. For a claim to be channeled and subject to the administrative channeling requirements under the Medicare statute, both the standing and the substantive basis of the claims have to arise under Medicare. Notably, it's the Public Health Services Act here, Your Honor, not the Medicare statute, which defines the scope and the parameters of the 340B program. Indeed, that statute defines covered entities, which includes both hospitals and a broad range of other non-hospital health care entities that qualify or are eligible under the program. It establishes the amount of the discount and the scope of the discount that hospitals and other health care providers receive. And notably, that discount isn't tied towards Medicare funding. The discount isn't a receipt of Medicare funds or any government funds, rather it entitles qualifying entities to purchase drugs from pharmaceutical manufacturers at discount, third-party transactions that have no bearing or relationship to Medicare whatsoever. It's the Public Health Services Act, again, and not Medicare, which establishes other compliance conditions or requirements for the program, including how when entities no longer meet the eligibility requirements, they're subject to termination and exclusion from the program. What about the government's argument that you're challenging the Medicare regulation? Well, that's right, Your Honor, but to be subject to channeling, there has to be both standing and the substantive basis has to arise relating to Medicare. And there's simply no claim that the standing for the injuries that hospitals face under the application of this rule to their deprival of their benefits of 340B arise under Medicare. The benefit itself is established and defined under the Public Health Service statute, Your Honor. And indeed, the Secretary cites no precedent, nor can they, that there's any precedent where courts have applied channeling in this manner to a benefit that exists entirely outside of Medicare and applies to benefits created under a separate statutory scheme altogether, Your Honor. What about Battle Creek? Battle Creek didn't address the 340B program, Your Honor. That related to the separate basis of jurisdiction that applies under 1395.00. As the Secretary pointed out, regarding final determinations, that's the amount of payment. And so that relates to the impact that hospitals face based on their Medicare dish payments, Your Honor. But Battle Creek said nothing about jurisdiction under the injuries that relate to 340B, Your Honor, which are derived and entrenched based on the Public Health Services Act. And I'm happy to address Battle Creek, but I just wanted to finish this point about jurisdiction under federal question jurisdiction relating to 340B injuries, Your Honor. It's clear that when the Secretary argues that it would be a different in kind if we were challenging a program determination or eligibility determination, it's clear that it's exactly what's occurring in this case, Your Honor. There's substantial risk of harm that as a result of the Secretary's exclusionary rule and the exclusion of these demonstration project days from the calculation of the dish percentage, that some hospitals will have to report on their cost reports dish percentages that fall below the eligibility criteria for 340B defined under the Public Health Services statute, again, Your Honor, not under Medicaid, that would render them ineligible under the program. That's only three of your hospitals, right? Four hospitals, Your Honor. That's correct. But it's well established under the Supreme Court law and otherwise that at least if there's a single plaintiff that has standing, that the court has jurisdiction to be able to hear the case on the merits. And notably, the four hospitals that we identified submitted declarations below, Your Honor, in support demonstrating, you know, attesting to the fact that in the coming weeks and months, but for the district court's vacature of the rule, that they would have been have to file cost reports that would show that they'd fall below the eligibility criteria and therefore subject to immediate termination and withdrawal from the program because, again, that's how the 340B program operates pursuant to the Public Health Services Act and how it's implemented by HRSA, not CMS, the agency that oversees Medicare. And as a result of that termination, Your Honor, that impending termination that they faced, they would have been excluded from the program altogether and they would have lost discounts immediately that they would have otherwise been eligible to receive. And the importance of that, Your Honor, as a basis of alternative jurisdiction, even if this court were to somehow conclude that these 340B injuries don't arise under the Public Health Services Act but somehow are indeed subject to channeling requirements, the importance of that, Your Honor, is that as soon as hospitals are terminated under the 340B program, they lose the discounts and they don't have the ability to recoup them after the fact, meaning that if the Secretary's theory of channeling were correct here, Your Honor, hospitals would have to undergo the channeling requirements, meaning that they'd have no ability to immediately challenge their termination but would instead have to go through the Notice of Program Reimbursement process that applies to Medicare-related payment procedures and then only then be able to, after that were finalized, be able to petition the Board in order to try to claim relief, but there would be no meaningful avenue for relief there because the Board is bound by the Secretary's rule and couldn't provide relief in terms of departing or waiving the final rule here. And so only then, when they reach court, could they then be able to obtain meaningful relief, which they would surely obtain under Forest General, but during the entire pendency of that time, the hospitals that are suffering these injuries would have no recourse, even if they prevailed, to recoup the lost discounts that they would have suffered during the entire pendency of channeling. And that underscores that even if this Court were to find that this case doesn't arise under 1331 jurisdiction of the first instance, it should apply the exemption to channeling established under Illinois counsel where there's a threat and loss of review altogether, which would be the case here, Your Honor, because these discounts could never be recouped during the entire pendency that channeling would occur, which is entirely different from all of the other instances where channeling is applied to Medicare-related claims where those benefits during the pendency review could be recouped or restored at the end of the process, meaning that the hardships that were defined and tolerated by courts in channeling Medicare benefits... Another way to make the point that I think Judge Ramirez was getting at, though, is that the participation in 340B is contingent on the DS-the-dish formula, and therefore the dish formula is sort of the precursor to the 340B. So you're sort of... I don't think it's circular, but you can't decide this unless you also know the dish payment. And then you get into the question, her theoretical argument, that somehow you don't know what your dish reimbursement is until retrospectively. Well, I don't think you need to know the dish payment in order to make the determination in terms of how it applies to 340B. You do have to adjudicate whether or not these days should be counted in the dish percentage calculation or not. Well, but I mean, it may... And if I understand it, 340B is something like a measure of whoever's eligible for drug... however many patients are eligible for those drugs. So DISH either does or does not treat them as Medicaid-eligible, but the claim is by the government that some of these... There are circumstances where even these non-eligible, these regarded as eligible, will still generate a dish payment. In other words, your hospital could have... These four hospitals could have a smaller dish payment but still qualify for 340B, right? That's correct, Your Honor. But we were talking about the circumstances here where the hospitals would fall below the DISH eligibility criteria... But I'm saying... ...in terms of the application of the rule. Application of what rule, 340B or the DISH rule? By the secretary's final rule excluding these demonstration project days.  But, I mean, they can't know that. Can they know that to a certainty any more than the Baylor hospitals know to a certainty whether DISH will yield, you know, some money when the year-end reports are filed? And this is a key distinction in terms of how the Medicare DISH payments are calculated and how 340B operates, Your Honor, which underscores that these 340B claims are separate and distinct from the Medicare claims. So for purposes of 340B, the hospitals have to report on their cost reports which precede the notice of program reimbursement and the calculation of the total DISH payment. So that's the first step in the process that hospitals on their own derive an estimated DISH percentage based on the available data to them and submit these cost reports to the Medicare administrative contractors. And as soon as on their self-submitted cost reports that hospitals disclose, and if the secretary's rule is still intact, applying the secretary's rule to exclude those Medicaid demonstration project days, those cost reports for those four hospitals we identified, Your Honor, would fall below the applicable eligibility criteria, and as soon as they file those cost reports, they're subject to termination. But the way the DISH payment program operates here on Medicare DISH payments... You're saying as soon as they report lower eligible patient days under the demonstration project, they know that they've fallen below the 340B. Exactly, and then they suffer the consequences of that. The Medicare DISH payments, Your Honor, though, the total amounts aren't determined until not when those initial cost reports are submitted, but until there's reconciliation in the Medicare administrative contractors.  Yeah, months if not years later, exactly. And so that underscores the irreparable and substantial harm... What's the point of this regulation? The secretary's regulation? Yes. You know, it's hard for me to presume. I think it's that the secretary has belabored this distinction for many years. I think they were upset with this court's decision in force general and haven't given up the fight in terms of trying to exclude uncompensated care days from the calculation of the regulation, Your Honor. Did this have anything to do with different treatment between states that have broadened Medicaid availability and those like Texas that I presume have a narrower Medicaid availability? Uh, it's hard for me to speculate, but you're certainly right, Your Honor, that the states that have been infected by this, that have adopted uncompensated care pools, cost pools, are states like Texas, that in the aftermath of FIB v. Sebelius, Your Honor, where the Supreme Court ruled that Medicaid was unduly coercive, and the Affordable Care Act for the Congress and the federal government to require states to expand their Medicaid programs, in the aftermath of that, Texas did work and other states worked constructively with the federal government to adopt these uncompensated care pool days to provide benefits to uncompensated and underinsured patients that didn't receive the expanded coverage under Medicaid as part of the Affordable Care Act structure, Your Honor. And that was done, again, collaboratively with the federal government, and that was the point of this decision in force general, which I'd like to touch upon for a moment, Your Honor, which is the point of the panel's decision there is that when the federal government authorized the demonstration project in the first instance and made the determination to treat the cost of that program, including the cost of the uncompensated care pool funds, Your Honor, and regard them as expenditures for purposes of receiving federal Medicaid payment dollars, Your Honor, it made a similar regarding determination as to those who were capable of receiving its benefits as being Medicaid-eligible. And therefore, by virtue of that determination, those patients would have to... Their patient days would go into the dish percentage calculation. Your Honor, again, the court clearly interpreted the statute in that way, saying that any discretion that the secretary had had to be exercised in how they approved and constructed the demonstration program, not that they could approve a demonstration project like they did here, Your Honor, and then after the fact seek to exclude those very same days in the calculation of the dish percentage. And the court's statements on that couldn't be any clearer, Your Honor. It said that once a secretary authorizes a demonstration project, no take-backs. The statutory discretion isn't discretion to exclude populations that the secretary has already authorized and approved for a given period. Its discretion is to authorize those populations in the first place. And that's exactly what the secretary is trying to do here, Your Honor. Indeed, with respect to Texas itself, Your Honor, the state... renewed the state's demonstration waiver program in 2021, two years after this court's opinion in Forest General, and renewed it without any conditions about regarding expenditures under the state's plan in terms of uncompensated care pool funds being included within that scope. But now it seeks, through this rule, to revise that determination after the fact, even though he treats and regards those expenditures as Medicaid for purposes of the demonstration waiver project, to exclude them for purposes of the dish calculation. This is millions of dollars, right? It's quite substantial, Your Honor. At least for the hospitals that we represent and have brought this complaint, it's tens of millions of dollars. And the 340B program discounts are also tens of millions of dollars, which again are non-recoverable during the pendency of any channeling that the secretary claims would otherwise be required here, Your Honor. I have a hypothetical for you. Let's say that the individuals who fall into this uncompensated care pool are counted. And the hospital still doesn't have enough to go over the threshold. Can the hospital challenge? So the threshold meaning they don't have enough to qualify as a Medicare? Exactly. I would say, Your Honor, there has to be a substantial risk of harm, and so the harm would be that they would be denied access or have lower Medicare dish payments, Your Honor. So would that claim have to be channeled? Would that claim? So our theory, to be clear, we're not talking about the 340B related injuries, which as I noted, there were declarations which attested to the very fact that these injuries were near and imminent as a result of the cost reports having to be filed. Now as it relates to the Medicare injuries, Your Honor, our claim for alternative jurisdiction under 1395.00, which is I think what you're getting to, Your Honor, is that there's been a final determination as to the amount of payment of those Medicaid demonstration project days in the advance of the cost year. And the hospitals, based on their prior submissions where they claim Medicare dish payment days, and based on their calculations for the upcoming year, can demonstrate with almost reasonable certainty that they'll be subject to the program or they would have received higher payments for the exclusion of these days. And indeed, again, when talking about how hospitals have to calculate their cost reports, again, they submit those months if not years before the Secretary makes its final determination. So hospitals are charting and having to make these projections all along, and it's also inherent as part of the prospective nature of the payment system under Medicare which requires to budget and forecast their operations and dollars prospectively, not the old system which these determinations were made after the fact, Your Honor. But if there's a dispute by the hospitals regarding what they're owed, how the calculations are made, don't those claims have to be channeled? Well, if you're talking about individuals, so for example, if there was a claim that there were days that were improperly counted, like 25 days instead of 50, or 50 rather than 100, yes, those go to factual inquiries that go to the total amount of program reimbursement under 1395-00, Your Honor. But here we have a final rule that was determined in advance of the cost year that categorically excluded these days altogether and assigned them a defined value of zero where the board itself has no discretion to unwind or modify that policy, Your Honor. But without the numbers, how can the hospitals say that they're going to fall under? We're saying that the value of the days have been assigned a value of zero, Your Honor, and that as a result of the information they have available to them, they expect that they would be impacted by receiving less payments than they would otherwise receive. But they won't know for sure until the end of the year when the final determination would normally be made. The exact amount of damages, yes, would not be fully, but there would be a substantial risk of harm, which is all that is necessary to establish standing, again, with the same type of standard that would apply to 340B-related or any type of injury that there's a substantial risk of harm that confers and establishes standing to pursue those claims. But there's a difference between standing and the finality determination that's required here. Well, again, Your Honor, I would say that, you know, the determination as to the amount of these days and the value of them is done in advance of the cost year, and that hospitals, based on their prior experience with the program and the budgeting and forecasting that they're required to do as virtue of the prospective payment system, have a reasonable degree of certainty that they'll be impacted and have alleged so, Your Honor, as well. And, again, the Secretary below didn't challenge standing with respect to either of the injuries that were claimed here. It just claimed that there wasn't jurisdiction. The alternatives for the hospitals assuming this new regulation takes effect are either to lose a lot of money or to make it up on those who are prepaying or just discontinue uncompensated care, right? That's right. Yeah, exactly. You're right, Your Honor. The entire purpose is, it's important not to lose purpose of what these dual payment regimes under Medicare and under the 340B program are meant to do. They're meant to restore or recoup hospitals from some of the losses that Congress noted that they incur by treating uncompensated care in low-income individuals. And it's important, Ben, if it's possible, to help with them unlawfully in direct defiance of Forest General and in a way they cannot recoup after the fact would cause them and their stakeholders and the patients they serve significant harm. So, you're not relying on... Just one more question and I'm sorry to... No, no. Happy to answer. Well, I know that from our standpoint. You're not relying on the Shalala or distinguishing Shalala, then? So, in the first instance, we claim that these 340B related injuries, Your Honor, do not arise under Medicare because they are established by the standing and particulars established by the Public Health Services Act. But as an alternative, Your Honor, we would say that if there were a determination that channeling were somehow to apply to the 340B related injuries that Shalala and the exemption for a complete loss of view should exempt that channeling, that ordinary channeling here, Your Honor, because of the fact that the lost discounts during the entire pendency of channeling can never be recouped or restored. There would be an entire loss of that benefit during the entire pendency of the regulatory... You're talking about the 340B. Yeah, that's right. But yeah, we haven't made a claim for Illinois Council with respect to Medicare DISH. It relates to the 340B related injuries. Right. Okay. Thank you. Thank you, Your Honor. Okay, Ms. Huchek. Your Honors, I'd like to first address the plaintiff's arguments about the 340B program and what they view as a separate injury. So we know from the Supreme Court for something to be not arising under Medicare, both the standing and the substance of the complaint have to be separate from Medicare. What we have here, what I've heard plaintiffs say is that they have an injury related to 340B. But I have not heard them articulate a legal claim or legal substantive theory that is different from Medicare with respect to 340B. Every aspect of their merits argument depends on an interpretation of the Medicare Act and an interpretation of Medicare regulations. This is not a case in which, for example, they have said, well, we think these regulations violate the statute that authorizes 340B. And I apologize. I think what I've heard plaintiffs say is that fundamentally their 340B injury is that they are concerned that they will submit cost reports, which, to be clear, they haven't done and which is required in order to get a final determination of payment, that they will submit cost reports to the 340B program and they won't be able to, for example, note that they are going to challenge those cost reports at a later date. I think they are upset that the 340B program doesn't allow them to correct for claims in the same way the Medicare program does. But this case is not a case in which they're challenging the 340B program or saying that that's an arbitrary way of doing things or asking this court to fundamentally change the way the 340B program operates. What they're doing is they're saying a Medicare regulation that governs Medicare payments is invalid under the Medicare Act. But they're also saying that the only way you get money under 340B is by going through the DSH program So it's not the only way Just to clarify, it's not the only way you can get a discount but that's one of many ways you can qualify. But I take the point that they're essentially saying and I think the best way to characterize this is there are downstream injuries in other programs because of the way in which these programs And what they're saying is they've presented this to the PRRB whatever it's called and the PRRB said go fly a kite and what they have until the pendency of the complete review of this new DSH regulation is that they will not several of the hospitals won't get anything on the 340B program and that is not reimbursable or recoupable. So your honor, essentially what I'm As I understand Plaintiff's argument, they are saying that they have harms downstream harms from this regulation that are outside of Medicare However, the Supreme Court has made very clear in Lala v. Illinois It's not outside of it though, but I mean you're this is not meaningless semantics it is dependent on according to their argument the new Medicare regulation So first, the fact that it's dependent on Medicare regulation I think shows that these are inextricably intertwined in the sense that this is undeniably arising under the Medicare Act and therefore there is no federal question jurisdiction under 1331 Except that one of the basis that the district court used for jurisdiction was the claimant's interest in having a particular issue resolved promptly is so great that deference is inappropriate. This isn't a question of deference, Your Honor. The statute and the Supreme Court have said that there has to be a final determination that if it's arising under Medicare you have to wait until these cost reports are submitted and there's a final determination that hasn't happened And the second thing that I would note is Shalala v. Illinois counsel also says that it doesn't matter if plaintiffs want injunctive relief the fact that plaintiffs may be able to assert irreparable harm, which related to their 340B discounts which by the way the district court found that there was not irreparable harm, but the fact that there might be irreparable harm doesn't mean you get to circumvent the statute. As long as there is meaningful judicial review of their legal challenge at the conclusion of the administrative proceedings which should be clear, there would be It is beyond dispute What's the normal gap between a hospital furnishing its year-end report and when all the oversight goes through and when they get money? Well it's months and months and months and months, right? But that's also true in lots of circumstances Well no, Medicare and Medicaid are sort of notorious for that Now that doesn't mean that the law isn't the law, but I'm just saying it's a practical matter and in the meantime what is the rationale other than well the secretary has discretion what is the policy rationale behind frankly screwing these hospitals out of reimbursement for these demonstration programs that the government already approved? Your honor, I think the policy rationale dating back to the very first regulations the ones that were promulgated in 2000 and 2003, has always been and the Supreme Court has discussed it in this way, that the purpose of dis-reimbursements is not to get the most money for hospitals, it's supposed to be a proxy for the low-income patients that you treat Well exactly, and if you don't give if they don't get the money then they either charge much higher rates to us, who have third party insurance or they discontinue the uncompensated care or they take I just want to clarify your honor these hospitals are receiving money from the Texas demonstration pool to cover uncompensated costs they're asking for additional money based on the fact that they received this money and as the secretary explained in the preamble to the regulations you're not disagreeing it's tens of millions of dollars and that's not chicken feed your honor, you have asked what the explanation was for this policy and I'd like to provide the answer I know I've run out of time so I will try to keep it short as the secretary explained at length in the preamble the point of the dish is to be a proxy for low-income patients the number of low-income patients that they treat and unlike when a state says I would like to extend full health insurance to this category of patients, payments to hospitals from the uncompensated care pool are not based on income. There could be a high income patient who says I'm not insured and I'm not paying my bill and that is a cost that the hospital can claim from the uncompensated care pool and so the secretary determined that just as a when we're trying to figure out what's a good proxy, this just isn't and it hasn't been in the same way that in 2003 before Congress ratified the regulations the secretary said when Medicaid extends some benefits like benefits for family planning or benefits for some limited services and not the full panoply of things that are available under the state plan, that's also not a good proxy for who is a low-income patient and so that's the purpose of this policy I had the impression from your brief that what we were talking about was not free-riding well-to-do people but people who were not fully covered by state Medicaid because some states had chosen not to expand Medicaid so in other words, we're not going to pay the hospitals for the poor people unless the states undertake broader Medicaid I'm sorry, I mean that's what I got out of your brief as one basis for the secretary but I think our brief was very clear that the concern is that it's supposed to be a proxy for low-income patients and that the fact that hospitals receive money from an uncompensated care pool is not a good proxy for how many low-income patients that they treat it's not a matter of punishing states, in fact, we're respecting states' choices, we noted in our brief that when Texas asked the secretary to authorize this project, it asked the secretary to authorize a project that specifically on its own terms did not provide benefits to patients, that the money was to hospitals and not supposed to be a benefit to patients, and that's a choice that the secretary has chosen to respect we would ask that this court reverse okay, thank you